## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, LOCAL 300, AFL–CIO, Respondent,

and

### Alex Cameron, Intervenor.

No. 78–2257.

United States Court of Appeals, Ninth Circuit.

Jan. 16, 1980.

---

Michael F. Messitte, Washington, D.C., for petitioner.

Lionel Richman, Richman & Garrett, Los Angeles, Cal., (argued), for respondent.

Alex Cameron, pro se.

Before WALLACE and TANG, Circuit Judges, and TURRENTINE,* District Judge.

WALLACE, Circuit Judge:

The National Labor Relations Board petitions for enforcement of its order, reported at 235 N.L.R.B. No. 45 (1978), against Laborer's International Union of North America, Local 300, AFL–CIO (Union), based upon the Board's finding that the Union had committed unfair labor practices in violation of section 8(b)(1)(A) and (b)(2) of the National Labor Relations Act, 29 U.S.C. § 158(b)(1)(A) and (b)(2). "The sections in brief provide that it shall be an unfair labor practice for a labor organization or its agents to restrain or coerce employees in

---

* Honorable Howard B. Turrentine, United States District Judge, Southern District of California, sitting by designation.

the exercise of their rights of self-organization and collective bargaining; or to discriminate against employees on the basis of union membership; or to cause or attempt to cause an employer to discriminate against an employee." *NLRB v. International Ass'n of Bridge, Structural Reinforcing & Ornamental .Iron Workers Local 75*, 583 F.2d 1094, 1095 n. 1 (9th Cir. 1978). We grant enforcement of the Board's order.

## I

Cameron, who is an intervenor before us and was a charging party before the Board, has been a member of the Union since 1958. From the spring of 1972, he has been active in his opposition to the leadership of the Union. At Union meetings, he has protested salary increases given to the Union officials, the hiring of certain Union employees, and Union dispatching practices which he considered to be in violation of the collective bargaining agreement between the Union and Memorial Park Development Association, Inc. (Memorial Park). In September 1973, and in January 1974, Cameron filed charges against the Union with the Equal Employment Opportunity Commission alleging, among other things, that the Union was unlawfully selling job referrals. Cameron also participated in the distribution of leaflets sharply critical of the Union's administration and, particularly, certain Union officers, including Business Manager Renteria, Secretary-Treasurer Enriquez, and President (then, vice president) Mobley.

Cameron and several others filed intraunion charges against certain Union officers including Renteria and Enriquez. Several Union members, including Cameron, filed an action in California Superior Court seeking injunctive relief for the alleged breach of the Union's constitution. Cameron also ran unsuccessfully for the position of auditor on a slate of candidates in opposition to the incumbent Union officers. Subsequent to the Union election, Renteria and two dissidents engaged in an exchange in which the dissidents inquired as to when they would be referred to work. Renteria stated that reaching the top of the Union out-of-work list would not, contrary to their expectations, bring work for the dissidents. Rather, Renteria told them: "Stop fighting me and you can go to work."

Prior to the incidents out of which the Board's order arose, Union Business Manager Renteria, Union President Mobley, and Union Dispatcher Turner were aware of Cameron's dissident activities. Indeed, during a staff meeting with Union dispatchers, business agents, and field representatives, Renteria stated that if Cameron "is caught on the job, any job, he will have your job and you will have his. That goes for the dispatcher that sends him out and the agent on the job that he is caught on."

## A.

With this background, we now discuss the facts which lead to the order we review. In late 1973, after hearing of a possible job, Cameron spoke with Memorial Park's Vice President Brown, who told him that if he could secure a referral slip from the Union, he would be put to work. Cameron went to the Union Hall and told Union Dispatcher Turner that he had a job and needed a referral slip. Turner replied that he could not give him one and referred to Cameron's having filed charges against the Union. Turner also stated that if he gave Cameron a work referral he would lose his job.

On December 5, 1973, Cameron again spoke with Turner about the Memorial Park job. Turner told him that he could not give him a work order because Cameron was "a political dissident." Cameron replied that he was going to work with or without a work order, and Turner stated: "That's up to you. Go ahead."

On December 6, 1973, Cameron commenced his employment with Memorial Park. At that time he was the seventh person on the first line of the Union's out-of-work board. Cameron and the Board concede that Cameron was not entitled to a work referral slip pursuant to the collective bargaining agreement between the Union and Memorial Park. At the job site, Union Business Agent Randolph asked Cameron if

he had a work referral. Although Cameron responded that he did not, Randolph told him that he could continue working. At the time, Randolph did not know Cameron, nor was he aware of his dissident activities.

Randolph visited the job site several times after December 6, but he apparently did not request a referral slip from Cameron. However, Union Business Agent Bibbs mentioned to Union Dispatcher Turner that if Cameron were found on a job, the Union agent in that area would be fired. Turner then informed Bibbs that Cameron was working at Memorial Park, in Randolph's area, but that he, Turner, had not dispatched him. Bibbs told Turner that he should warn Randolph. Thereafter, Turner told Randolph about Cameron and that he was working in his area.

On the morning of January 3, 1974, Randolph went to the job site, identified Cameron, and informed him that, pursuant to instructions from Renteria and Mobley, he was to remove him from the job. Cameron responded that Memorial Park had to agree before he could be fired.

About noon, Randolph returned to the job site with Turner. Turner told Cameron that Renteria had issued instructions to find Cameron and get him off the job. Randolph told Memorial Park Superintendent Carroll that he had come to remove Cameron. Carroll then advised Cameron that he did not want any trouble with the Union and sent Cameron to see Memorial Park Vice President Brown. Cameron located Brown and advised him of the situation. Following a telephone call to the Union hall, Brown also told Cameron that he did not want any trouble with the Union. These facts constitute the basis of the first charge against the Union.

### B.

Nine months later, in October 1974, Cameron went to a different Memorial Park job site and was told by job foreman Colbert that there was a job available. Cameron asked him for a work order request and said that he would get clearance from the Union. Colbert did not have the proper re-

quest form available and told Cameron to come back later to pick one up.

Cameron went to the Union hall where he spoke to Martinez, who was both Renteria's personal secretary and a Union supervisor. Martinez was responsible for granting or denying employers' "by name" requests for workers. Cameron told her that he had a job with Memorial Park and asked her for a work referral slip. Martinez asked Cameron if he had a copy of the work order by which he was originally dispatched to that job. (Martinez was aware of Cameron's name in connection with previously filed unfair labor practice charges, and as part of the investigation of those charges had earlier verified that Cameron had not been dispatched by the Union when he earlier worked at Memorial Park.) When Cameron told her he could not produce a copy of his original work order, Martinez told him that she could not give him a work referral. Cameron then asked Martinez if she would do so if he got a letter from Memorial Park, but Martinez did not answer.

On the way back to get his job request form from Colbert, Cameron saw Randolph and told him that Memorial Park was requesting him for work. Randolph replied that if he got a written request from Memorial Park, the Union would have to honor it. Randolph then told Cameron to be at the Union hall at four p. m. and he would see that Cameron got a work referral slip, if Cameron had a written request. Cameron then obtained a "by name" job request signed by Colbert on behalf of Memorial Park.

Cameron returned to the Union hall with the written job request, where he told Union President Mobley about his conversation with Randolph. Mobley told him to wait for Randolph. About five p. m., Cameron, Mobley, Randolph and Martinez met in a Union hall office. Martinez informed Mobley that she had called the Union's attorney about Cameron's request for a work referral slip. Martinez reported that the attorney had advised that in view of the charges filed by Cameron with respect to this job, it would not be wise to give him a work

referral. Randolph stated that if Cameron were to drop the charges, he would see that Cameron got a work order. Cameron then left the office.

The parties stipulated that the Union's attorney was prepared to testify that he did speak with Martinez about Cameron's request for a referral slip in light of Cameron's pending charges pertaining to the earlier Memorial Park job. He would also state that they had agreed that because Cameron's earlier period of employment, which was necessary for the "by name" request, was obtained in violation of the collective bargaining agreement, it was not advisable to honor the current "by name" request.

Several months later, in front of the Union hall, Cameron asked Union President Mobley when the Union officers were going to let the jobs start "hitting the board." Mobley replied that as far as he was concerned, the jobs would never hit the board for Cameron.

### C.

The Board, in agreement with the Board's hearing officer, found that the Union violated section 8(b)(1)(A) and (b)(2) of the Act by causing Memorial Park to discharge Cameron in January 1974, and by refusing to refer Cameron to a job with Memorial Park in October 1974, both because of Cameron's Union activities and because of "irrelevant, invidious or unfair considerations." The Union argues that we should consider the facts surrounding each of these two incidents independently. It contends that it had a lawful right to remove Cameron from the Memorial Park job in January 1974 because he held the position in violation of the collective bargaining agreement hiring hall provisions. As to the later incident, the Union argues that its reliance on its attorney's conclusion that Cameron was not eligible for the "by name" work request in October 1974 was in good faith and not for invidious or discriminatory reasons.

### II

We first address the Union contention that because Cameron had violated the hiring hall provisions of the collective bargaining agreement in securing the position initially, the Union's action was proper. This argument is premised upon the well-established rule, recognized by the Board in this case, that nondiscriminatory hiring hall provisions are permissible and may lawfully be enforced by a union. *Local 357, Int'l Bhd. of Teamsters v. NLRB*, 365 U.S. 667, 671–77, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961); *NLRB v. International Ass'n of Bridge, Structural Reinforcing & Ornamental Iron Workers Local 75*, 583 F.2d 1094, 1097 (9th Cir. 1978) (*Local 75*).

The Union places particular reliance upon the following language from *Local 75*:

> We . . . hold as a matter of law that respect by Local 75 for the nondiscretionary referral process it was required to follow by its collective bargaining agreement cannot be held to be an unfair labor practice; nor is it subject to an examination of motive to ascertain whether it was pretextual.

583 F.2d at 1097. We also stated that even union motives that "render its dutiful performance a happy one cannot change the fact that [the union] did what it was contractually required to do." *Id.* We distinguished cases which had found violations of the Act on the basis of a union's discriminatory exercise of discretionary authority. *Id.* The Union argues that the only difference between this case and *Local 75* is the greater glee with which the Union officers enforced contractual hiring hall provisions against Cameron. The more significant, and indeed dispositive, difference, however, is the inconsistency with which the Union in this case enforced the hiring hall provisions.

In *Local 75*, we were careful to emphasize that the only instance in the record of a violation by the union of its contract involved an "extraordinary situation" in which the local granted referral cards to workers hired out of order due to exigent circumstances. 583 F.2d at 1097. In the case before us, however, the Board found, and the Union does not now dispute, that Randolph failed to cause Cameron's remov-

al from the Memorial Park job when he first learned in early December 1973 that Cameron did not have the requisite referral slip. Rather, Randolph caused Cameron's removal from the job only when he was advised of Cameron's dissident activities. The Union has not suggested that Randolph's actions were extraordinary or the result of temporary and exigent circumstances.[1] We conclude that the Union's enforcement of the hiring hall provisions under these circumstances may support a finding that the Union committed an unfair labor practice. Contrary to the situation before us in *Local 75*, we cannot say that the Union here has "respect[ed] . . . the nondiscretionary referral process it was required to follow by its collective bargaining agreement." 583 F.2d at 1097. The Union's behavior toward Cameron clearly demonstrates that the Union did not uniformly respect its contractual obligations, and that it had injected some element of discretion into its enforcement of the hiring hall provisions of the agreement.

We find support for our conclusion from *Construction, Bldg. Materials & Misc. Drivers Local 83 v. NLRB*, 590 F.2d 316 (9th Cir. 1979) (per curiam) (*Local 83*), enforcing 233 N.L.R.B. 509 (1977). There we enforced the Board's order which, among other things, concluded that union action similar to that which occurred here constituted an unfair labor practice. Although the record in *Local 83* evidently revealed numerous instances of contractual violations and discrimination against those in disfavor with the union, the Board affirmed the hearing officer, who specifically found unlawful discrimination in a single instance of disparate treatment in violation of the union's hiring hall practices.

■ In *Local 83*, the charging party, Matuszak, had been on the union's "B" list, which was, for the purposes of the job referral at issue, the list with the lowest

priority. The "C" list had the highest priority, followed by the "A" list. The union dispatcher offered a "C" list job to a union member on the "A" list without first exhausting the "C" list. When this individual declined the job for lack of experience, Matuszak, who was in the hiring hall and who had had the requisite experience, informed the dispatcher that he would take the job. The dispatcher refused to refer him to the job purportedly because the job was a "C" list job, for which Matuszak was not eligible. 233 N.L.R.B. at 513. The hearing officer stated:

> While I would not view as discriminatory a refusal to dispatch Matuszak from the "B" list to a "C" list job in circumstances where the prescribed dispatch and referral rules were consistently followed, where they are not followed as in the instant case, where it was known he was qualified and available in the hiring hall, and where the evidence clearly establishes [the union's] animus towards Matuszak, the refusal to dispatch him . . . can only be viewed as discriminatory and in violation of . . . the Act.

*Id.* Thus, although the union follows its hiring hall rules in doing so, a single instance of discriminatory treatment will support a finding of unlawful discrimination when those rules are not consistently followed. As in *Local 83*, the Union here did not consistently follow its hiring hall rules.

To be sure, the rules in this case have a contractual basis, while in *Local 83* it appears that the rules merely represented established union practice. *See id.* at 510. Even so, the principle is the same. When a union introduces an element of discretion into what is otherwise a non-discretionary process, the union may be held accountable for discriminatory exercise of that discretion.

---

1. Cameron did attempt unsuccessfully at the hearing to introduce other evidence regarding several instances of what he alleged were violations by the Union of the collective bargaining agreement's hiring hall provisions. In view of the clear discrimination against him by Ran-

dolph which is in the record, we need not consider the question raised here by the Union whether Cameron preserved his right to challenge the hearing officer's decision to exclude that evidence.

The Union also contends that enforcement of the Board's order is precluded by *Laborers' Local 300 (Desert Pipeline Constr. Co.)*, 145 N.L.R.B. 1674 (1964), *enforced*, 392 F.2d 581 (9th Cir. 1968) (per curiam). There a contractor had a right, pursuant to a collective bargaining agreement, to bring three "key" laborers from another area, but was obligated to obtain the remaining laborers from the local union. The Board found that, although the union had properly and without discriminatory motive demanded that the employer honor the contract and discharge two of its five laborers from outside the area, it committed an unfair labor practice by specifying which two employees should be released on the basis of discriminatory motives. Nevertheless, the Board modified the order of the trial examiner granting back pay to both employees, reasoning that it was possible that "[the employer] would have voluntarily terminated one or both of these employees under its normal nondiscriminatory reduction-in-force standards." *Id.* at 1675 n.1. In the separate proceeding to determine the appropriate back pay, it was determined that the employer would have terminated one employee and retained the other because of seniority. *Desert Pipeline Constr. Co.*, 159 N.L.R.B. 1128 (1966). Back pay was accordingly denied the employee who would have been discharged in any event.

To the extent that the Union reads *Desert Pipeline* as somehow justifying the termination of the second employee as warranted by the contract, it is simply ignoring the fact that the Board found a statutory violation as to both employees. Moreover, we reject the Union's contention that *Desert Pipeline* is controlling on the question whether back pay was properly granted in the case before us. The Board in *Desert Pipeline* found that the discriminatory animus of the union was not the cause of the employee's discharge since forces already set in motion would have had the same result. Under those circumstances, back pay would have been punitive rather than compensatory and thus beyond the authority of the Board to grant. *See id.* at 1136.

By contrast, the evidence in the case before us demonstrates that Randolph decided to enforce the hiring hall provisions only when he discovered who Cameron was. The Board was thus justified in concluding that, but for the animus harbored against him by the Union, Cameron would have continued to be employed by Memorial Park. Cameron is thus in the position analogous to the employee in *Desert Pipeline* who would have been retained except for the Union pressure. *See also Local 83, supra*, 233 N.L.R.B. 509 (discriminatory refusal to refer worker justified back pay from date of such refusal even though facially neutral rules would have precluded the referral). The relevant inquiry in each case is whether the individual alleging discrimination would have been retained on or referred to the job in question but for the animus which the union harbors against him or her. If so, an award of back pay is compensatory, not punitive.

"The role of this court in reviewing the Board's order is to determine whether its decision is a proper application of the law and is supported by substantial evidence on the record as a whole." *Loomis Courier Serv., Inc. v. NLRB*, 595 F.2d 491, 494 (9th Cir. 1979) (footnotes omitted). We have concluded that, although the Union could have caused Cameron's discharge pursuant to a nondiscriminatory application of the collective bargaining agreement, the Board could properly find in the circumstances of this case that the Union chose to apply the agreement because of its dislike for him. In view of the evidence of Union animus toward Cameron, not contested by the Union here, and the conduct of Randolph with respect to the Memorial Park job, we conclude that there is substantial evidence in the record as a whole to support the Board's order regarding Cameron's January discharge.

### III.

We now turn to the Union's arguments that it did not discriminate against Cameron in refusing to refer him to the job in October because it relied on the Union at-

**210**

torney's good faith interpretation of the collective bargaining agreement's hiring hall provisions. The attorney was required to determine whether a "by name" request for a referral should be honored when the worker's previous employment, upon which the request must be based, was obtained without a proper referral. ·

The attorney's stipulated testimony, which was credited by the hearing officer, suggests that the attorney made a good faith attempt to interpret the agreement. The Union therefore argues that there is not substantial evidence in the record to support the hearing officer's finding, affirmed by the Board, that the Union discriminated against Cameron in its refusal to refer Cameron in October.

The Union position misses the point. Whether or not the attorney's good faith interpretation of the agreement supported the Union's action is only one factor to be considered in the analysis of why the Union refused to refer Cameron. It is the intent of the Union, not the attorney, which is paramount in this case.

 As detailed earlier, Martinez, the Union official responsible for handling "by name" requests, was aware of the unfair labor practice charges filed by Cameron against the Union. Although the Union attorney discussed his interpretation of the agreement with Martinez in their telephone conversation, she referred to Cameron's previous charges against the Union only in the subsequent meeting at the Union hall with Cameron. Moreover, Randolph told Cameron that Cameron could acquire a referral if he were to drop the charges. This sequence of events, considered along with the strong animus which the Union harbored toward Cameron, and particularly in view of the conversations between the Union officials and the dissidents in November 1974 and March 1975, and the previous treatment of Cameron in connection with the earlier Memorial Park job, amply support the Board's conclusion that the Union refused to refer Cameron in October "because of [his] union activities and because of irrelevant, invidious or unfair considera-

tions," and not because of the Union attorney's interpretation of the agreement. " 'If facts are open to conflicting inferences, we are not at liberty to draw an inference different from the one drawn by the Board, even though it may seem more plausible and reasonable to us.' " *Queen Mary Restaurants Corp. v. NLRB*, 560 F.2d 403, 407 (9th Cir. 1977) (quoting *NLRB v. Millmen Local 550*, 367 F.2d 953, 956 (9th Cir. 1966)).

IV.

We conclude there was substantial evidence in the record as a whole to support the Board's finding that the Union had, in fact, committed the charged unfair labor practices. The Board's order will, accordingly, be enforced.

ENFORCED.