**M.W. KELLOGG CONSTRUCTORS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**M.W. KELLOGG CONSTRUCTORS, INC., Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF the PLUMBING AND PIPE FITTING INDUSTRY OF the UNITED STATES AND CANADA, LOCAL 250, AFL–CIO, Respondent.**

Nos. 85–7078, 85–7167 and 85–7170.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Jan. 6, 1986.

Decided Dec. 30, 1986.

William C. Bottger, Jr., Latham & Watkins, Thomas W. Shreve, Los Angeles, Cal., for Kellogg.

Jeffrey L. Cutler, Davis, Frommer & Jesinger, Los Angeles, Cal., for Local 250.

Jerrold Wohlegemuth, Sandra S. Elligers, Atty., N.L.R.B., Washington, D.C., for N.L.R.B.

Before WALLACE and SCHROEDER, Circuit Judges, and THOMPSON,* District Judge.

WALLACE, Circuit Judge:

Section 8(a)(3) of the National Labor Relations Act (NLRA) makes it an unfair labor practice for an employer by "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). Section 8(b)(2) of the NLRA makes it an unfair labor practice for a union "to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3)." 29 U.S.C. § 158(b)(2). However, section 8(f) exempts from section 8(a)(3) a construction industry agreement that "provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area." 29 U.S.C. § 158(f)(4). This case concerns whether a series of layoff and overtime decisions made by an employer, M.W. Kellogg Constructors, Inc. (Kellogg), falls within the terms of section 8(f). The National Labor Relations Board (Board) determined that it did not. We conclude that we cannot sustain the Board's order.

I

Kellogg is a general contractor and employer in the construction industry. Local 250 is a union of plumbers and pipefitters affiliated with the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry (Union). Kellogg is a party to a national collective bargaining agreement between the National Constructors Association, of which it is a member, and the Union. This agreement provides that certain practices and terms of the local agreement should control so far as they are not inconsistent with the national agreement. Local 250 supplied workers to Kellogg on a construction project, pursuant to national and local collective bargaining agreements.

The project was staffed through Local 250's hiring hall and, pursuant to provisions of the local agreement, Local 250 maintained a "book system" of employment preferences. Book 1 consisted of employees who, within the past three years, had 3,000 hours of employment in Local 250's geographical jurisdiction under a collective bargaining agreement covering pipefitting. Books 2 and 3 encompassed those with 3,000 hours of the requisite employment within progressively wider geographical boundaries, and Book 4 was for those with fewer than 3,000 hours of employment. The local agreement provided for preferences in referral for hiring, with greatest preference going to those in Book 1. The parties agree that this practice is lawful pursuant to section 8(f). Neither the local agreement nor the national agreement made any explicit provision for preferences in selection for overtime assignments or for layoffs.

---

* Honorable Bruce R. Thompson, United States District Judge, District of Nevada, sitting by designation.

During much of the construction on the project there was a shortage of Book 1 journeymen pipefitters. Local 250 therefore referred to Kellogg a number of pipefitters and plumbers registered in Books 2, 3 and 4 who were "travelers." Travelers are members of Union locals who leave the area of their home locals to travel to other areas in search of work. The Constitution of the Union requires a traveler to obtain a "travel card" from his home local and to deposit it with the local union within whose jurisdiction he seeks to work. Travelers who deposited cards with Local 250 usually were not qualified for Book 1.

Layoff and overtime decisions resulted in a discernible pattern of preferences for employees who were members of Local 250 over nonmember travelers. This pattern was coupled with statements by Kellogg and Local 250 officials suggesting that local hands were being favored over travelers as a matter of company and union policy. Some travelers believed they were being unfairly discriminated against and filed a charge. An administrative law judge (ALJ) interpreted statements by supervisory employees and Local 250 officials to indicate that Kellogg intentionally discriminated against travelers because they were not members of Local 250. Kellogg was thus deemed guilty of an unfair labor practice under sections 8(a)(1) and (3) of the NLRA. The ALJ concluded, however, that Local 250 had not "caused" this discrimination, because he believed Kellogg had adopted the practice of discriminating against travelers without any explicit acts of inducement by Local 250.

The Board reversed the ALJ's conclusions as to causation by Local 250. *M.W. Kellogg Constructors, Inc.*, 273 N.L.R.B. No. 134 at 7–11 (1984) (Board dec.), 118 L.R.R.M. 1616. The Board concluded that section 8(f)(4) did not apply, and that both Kellogg and Local 250 had committed unfair labor practices. *Id.* at 2, 7. Kellogg applies for review of the Board order, No. 85–7078. The Board cross-applies for enforcement against Kellogg, No. 85–7167, and applies for enforcement against Local 250, No. 85–7170. We have jurisdiction to review the Board's final order pursuant to 29 U.S.C. §§ 160(e), (f).

The Board's order should be enforced if it is " 'a proper application of the law and is supported by substantial evidence on the record as a whole.' " *NLRB v. Laborers' International Union, Local 300*, 613 F.2d 203, 209 (9th Cir.1980) (*Laborers'*), *quoting Loomis Courier Service v. NLRB*, 595 F.2d 491, 494 (9th Cir.1979) (footnotes omitted). The Board's factual determinations must be upheld if there is "a choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *see Laborers'*, 613 F.2d at 210. We grant Kellogg's petition for review and deny enforcement of the Board's order both as to Kellogg and as to Local 250.

## II

Kellogg contends that the evidence does not support the conclusion that it intentionally discriminated against travelers because they were nonmembers of Local 250 in violation of section 8(a)(3). Kellogg argues that the pattern of preferences for Local 250 members amounts to nothing more than the application of the four-book system to overtime and layoff decisions as well as to hiring. The Board admits that an agreement to use the four-book system of preferences for layoff and overtime decisions would be legal under section 8(f)(4). Such an agreement need not be in writing, or expressed explicitly in the collective bargaining agreement, in order to be effective under section 8(f)(4). *Cf. Certified Corp. v. Hawaii Teamsters, Local 996*, 597 F.2d 1269, 1272 (9th Cir.1979) (collective bargaining agreements need not be in writing).

The Board concluded that Kellogg did not rely on the books in making overtime and layoff assignments. Rather, these decisions were, according to the Board, "based only on each employee's status as a local member or traveler, not on their [*sic* ]

book dispatch priority." Board dec. at 6 n. 8, 118 L.R.R.M. at 1619 n. 8. Kellogg and Local 250 argue that even if this is true, section 8(f)(4) should apply because the overtime and layoff decisions *paralleled* those that would be authorized by section 8(f)(4) had the decisions been made pursuant to the priorities laid out in the four-book system. Because application of the concededly legal four-book preference system to overtime and layoff decisions would have resulted in substantially the same decisions as were actually reached, Kellogg and Local 250 both contend that the Board's finding of an 8(f)(4) violation is based entirely in "semantics" and can have no substance.

### A.

Kellogg and Local 250 argue that the motive underlying adoption of an 8(f)(4) agreement is irrelevant and, therefore, we should not consider whether the agreement was adopted because it would tend to benefit local union members over travelers. From this they apparently extrapolate that the motivation for employment decisions themselves is irrelevant if a proper section 8(f)(4) agreement could have led to the same results.

Other circuits perhaps have looked beyond whether specific criteria are permissible and have focused on the intended *effects* of an agreement to conclude that it is invalid under section 8(f)(4) if it operates to benefit union membership. *See Ward v. NLRB*, 462 F.2d 8, 9 n. 1, 11–12 (5th Cir. 1972) (section 8(f)(4) agreements are lawful if "in their practical operation and effect they do not discriminate against employees on the basis of union affiliation"; defense of geographical preference rejected because "the Union was interested in jobs for local people only to the extent that such local people were members of the Union within its territorial jurisdiction"); *NLRB v. Local 269, International Brotherhood of Electrical Workers*, 357 F.2d 51, 56–57 (3d Cir.1966) (*Local 269*) (also focusing on effects, to hold that section 8(f)(4) agreements may not be used "as a guise for

achieving illegal discrimination"). Kellogg and Local 250 point out that an agreement based on considerations authorized by section 8(f)(4) often will have a substantial disparate impact on travelers, because they are less likely to have as much experience in the area as most of the local union members.

The very purpose of section 8(f)(4), however, was to immunize certain agreements and practices from unfair labor practice charges under section 8(a)(3). We therefore conclude that an agreement is not necessarily excluded from section 8(f)(4) merely because its *effect* may be to advantage local union members and to disadvantage travelers and other nonmembers of the local union. Nor does an agreement fall outside section 8(f)(4) on the ground that a union and employer adopted the agreement because of its disparate impact between local union members and nonmembers. A contrary ruling would be absurd, since it would mean section 8(f)(4) applied only where a section 8(a)(3) violation would not lie in any event.

All Congress demanded with section 8(f)(4) was that appropriate objective standards be adopted. Thus, where a facially valid referral agreement is uniformly applied, we will not consider the motives underlying its adoption. *See Laborers'*, 613 F.2d at 207; *NLRB v. International Association of Bridge Workers, Local 75*, 583 F.2d 1094, 1097 (9th Cir.1978). We thus construe statements in the legislative history that section 8(f)(4) agreements must be applied in a nondiscriminatory fashion, S.Rep. No. 187, 86th Cong. 1st Sess. 28, *reprinted in* 1959 U.S.Code Cong. & Ad. News 2318, 2345 (subsection authorizes use of "objective criteria which shall be applied without discrimination"), to mean that where such agreements are adopted they must be applied uniformly, without reference to whether any given individual is a union member. *Cf. Laborers'*, 613 F.2d at 207–09 (hiring hall provisions must be applied in a nondiscriminatory fashion).

## B.

■ None of this aids Kellogg or Local 250. The Board concedes that they could legally have agreed to apply the four-book system of preferences, despite its effect of benefiting local union members and disadvantaging travelers. The Board does not condemn their motivations in adopting an agreement regarding overtime and layoffs. The Board contends rather that the agreement they did adopt and execute fails to come within the terms of section 8(f)(4), because it provided for decisions to be made not on the basis of any protected ground, but on the basis of union membership alone.

Section 8(f)(4) protects employer-union agreements to "provide for priority in opportunities for employment based upon length of service with [an] employer, in the industry or in the particular geographical area." If Kellogg's employment decisions were not made pursuant to such an agreement, then they are not protected by section 8(f)(4). Section 8(f)(4) provides only a limited exception to section 8(a)(3) liability, and we cannot extend its scope beyond what Congress authorized. See Robertson v. NLRB, 597 F.2d 1331, 1335–36 (10th Cir.1979); Fruin-Colnon Corp. v. NLRB, 571 F.2d 1017, 1021 (8th Cir.1978); NLRB v. United Association of Journeymen, Local 633, 424 F.2d 390, 392–93 (6th Cir.1970) (Local 633). Considering statements in the legislative history that discrimination in the application of 8(f)(4) agreements cannot be tolerated, we certainly cannot extend section 8(f)(4) to protect agreements that provide for discrimination on the basis of union membership alone. See Local 633, 424 F.2d at 393; cf. Local 269, 357 F.2d at 57 ("Preconditioning the hiring of employees upon union membership is an unfair labor practice in all industries, including the building and construction industry.").

The fact that Kellogg could have made substantially the same overtime and layoff decisions pursuant to the four-book system is irrelevant if in fact the decisions were made on the basis of other, prohibited con-

siderations such as union membership. See Laborers', 613 F.2d at 208; NLRB v. Inland Empire Meat Co., 611 F.2d 1235, 1238 (9th Cir.1979); see also Townsend & Bottum, Inc., 722 F.2d 297, 299 n. 4, 302 (6th Cir.1983).

The relevant question, then, is not whether Kellogg and Local 250 could have adopted a valid 8(f)(4) agreement to apply the four-book system to layoffs and overtime. The question is whether they actually did adopt and apply the four-book system to layoff and overtime selections. If Kellogg and Local 250 instead discriminated on account of union membership, as the Board found, they cannot immunize their conduct by citing section 8(f)(4) and the four-book system of hiring preference as a post hoc rationalization for prohibited conduct. Because the true basis of the layoff and overtime decisions is a question of fact, see Local 357, International Brotherhood of Teamsters v. NLRB, 365 U.S. 667, 675, 677, 81 S.Ct. 835, 839, 840, 6 L.Ed.2d 11 (1961), we must uphold the Board's finding if supported by substantial evidence on the record considered as a whole.

## III

Before discussing the substantial evidence question, we first address the contention of Kellogg and Local 250 that the ALJ and Board misallocated the burden of proof in this unfair labor practice case. They contend that because this case turns on the applicability of section 8(f)(4) it was improper for the Board to apply the shifting burden of proof adopted in Wright Line, a Division of Wright Line, Inc., 251 N.L.R.B. 1083 (1980) (Wright Line), enforced, 662 F.2d 899 (1st Cir.1981), cert. denied, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982); see also NLRB v. Transportation Management Corp., 462 U.S. 393, 400–03, 103 S.Ct. 2469, 2473–75, 76 L.Ed.2d 667 (1983); Airport Parking Management v. NLRB, 720 F.2d 610, 613 (9th Cir.1983). Apparently they believe that the ALJ first concluded that the evidence that disproportionately more travel-

ers than Local 250 members were laid off and disproportionately fewer received overtime established a prima facie case that section 8(a)(3) was violated, and that *Wright Line* therefore shifted to Kellogg and Local 250 the burden of proving that the layoff and overtime decisions were made on the basis of valid section 8(f)(4) considerations. On the contrary, it is apparent from his opinion that the ALJ first evaluated whether there was a violation of 8(a)(3), reading that section in conjunction with section 8(f)(4). Only after he concluded that the 8(f)(4) defense was invalid, and that Kellogg had committed discriminatory practices unlawful under section 8(a)(3), did he apply *Wright Line* to the question of whether those discriminated against would have been laid off or denied overtime on the basis of other valid considerations, such as relative skill or competence. The Board adopted the ALJ's application of *Wright Line.*

■ The argument advanced by Kellogg and Local 250 also raises substantial questions regarding the parties' relative burdens in cases where an 8(f)(4) defense is raised. Because section 8(f)(4) provides that certain conduct by definition shall not be considered to violate section 8(a)(3), Kellogg and Local 250 seem to contend that where the employer or union is engaged in the construction industry, an initial element of the General Counsel's showing of an 8(a)(3) violation in every case must be proof that an alleged unfair labor practice was not protected by a valid 8(f)(4) agreement. We disagree. The existence, terms, and application of such an agreement are peculiarly within the knowledge of the party charged with an unfair labor practice. Thus, the burden of first raising section 8(f)(4) must lie with the party claiming its protection. The General Counsel need not, as a preliminary matter, disprove the existence of a defense which a party might never raise.

■ Only after section 8(f)(4) is invoked by a party is the General Counsel required, in order to satisfy the burden of showing the elements of an unfair labor practice, to disprove reliance on a valid 8(f)(4) agreement. This does not mean, however, that the party may prevail merely by suggesting that a section 8(f)(4) agreement exists. Because the existence and terms of an agreement, and the degree of the employer's reliance upon it, are peculiarly within its knowledge, a party invoking section 8(f)(4) must come forward with evidence regarding the agreement. *See Local 633,* 424 F.2d at 392 (requiring "specific affirmative testimony" that a valid section 8(f) agreement existed and was followed); *cf. Snow v. NLRB,* 308 F.2d 687, 695 (9th Cir.1962).

We do not understand the decision by the Board to deviate from these principles. In this case the General Counsel produced evidence that there was a disproportionate pattern of preferences for Local 250 members, and that Kellogg foremen and Local 250 officials made statements suggesting that travelers were being discriminated against. This was sufficient to support the finding of 8(a)(3) and 8(b)(2) unfair labor practices under traditional analysis. The charged parties interposed the defense of section 8(f)(4), thus placing on the General Counsel the burden of proving that a valid 8(f)(4) agreement was not relied upon. The Board concluded that the General Counsel carried this burden, so that section 8(f)(4) did not apply.

### IV

■ The Board based its findings that the four-book system was not adopted or followed primarily upon statements made by Kellogg foremen and union stewards to the effect that "local hands" would receive overtime but "travelers" would not, and that "travelers" would be laid off before "local hands." We agree with both Kellogg and the Board that the statements were sufficient to establish the existence of an unwritten agreement or understanding between Kellogg and Local 250 with respect to the order of preferences for layoffs and overtime. Kellogg foremen told travelers that their selections were based on union demands or policy. It is clear,

too, that application of the agreement had the practical effect of favoring Local 250 members over travelers. What is more difficult is to determine the *substance* of that agreement. Was it an agreement to favor Local 250 members as such, as the Board concluded? Or was it an agreement to apply the four-book system of priorities as Local 250 and Kellogg seem to contend?

Kellogg and Local 250 claim that under the four-book system of preferences, the ultimate result would be that Local 250 members would be the first to get overtime, and travelers would be the first to be laid off. Thus, they say, the statements by company and union officials, that only "local hands," or "Local 250 members" would get overtime, and that "travelers" would be selected for layoffs, were manifestly true statements describing the effect of application of the four-book system. From this perspective, the statements do not suggest that union membership itself was an operative consideration in making layoff and overtime selections. Rather, say Kellogg and Local 250, they were a shorthand form of expression describing the practical effect of decisions conforming to the four-book system. *But cf. Pennypower Shopping News, Inc. v. NLRB*, 726 F.2d 626, 629–30 (10th Cir.1984) (when the employer makes ambiguous statements from which employees may reasonably infer that they are being discharged because of protected activity, "the burden of the ambiguity must fall on the company").

Kellogg cites the ALJ decision for the proposition that "[a]t all relevant times Book I was composed *almost entirely* of Local 250 members and Books II, III and IV were composed *entirely* of travelers," (emphasis added). As a result, it argues "local hand" and "Local 250 member" were synonymous with Book 1 status, and merely provided a convenient mode of expression which evidenced no intent to discriminate on the basis of local union membership as such.

If the facts were as Local 250 and Kellogg thus contend, the situationally ambiguous statements relied upon by the ALJ

and Board might be insufficient to demonstrate discrimination on account of local union membership. However, in making this argument, Kellogg seriously misstates the ALJ's findings. The ALJ found that those who qualified for Book 1 "were *usually* members of the Respondent Union," and that those "who qualified for the remaining three categories, Books 2, 3 and 4, were *usually* either travelers or nonmembers of a [Union] local." ALJ dec. at 6 (emphasis added). Obviously, if the identity of Book 1 with Local 250 members, or of Books 2 through 4 with travelers, breaks down, there is little foundation for the argument that "travelers" and "local hands" were innocently descriptive words demonstrative of no intent to discriminate with respect to local union membership itself.

Once Kellogg and Local 250 interposed the section 8(f)(4) defense, it was imperative for the General Counsel to carry the burden of disproving reliance on the four-book system. Neither the Board nor the ALJ made any explicit finding as to the effect of the workforce composition on the meaning of the words "traveler," "local hand," or "Local 250 member," on this particular job. In the absence of any such finding, we are not in a position to review the Board's conclusion that there was discrimination based upon union membership and to determine whether it is supported by substantial evidence in the record considered as a whole. Thus, we are unable to determine whether the General Counsel carried the burden of disproving reliance on the four-book system pursuant to a valid 8(f)(4) agreement. We therefore remand this case so the Board may be afforded the opportunity to make appropriate findings as to whether the General Counsel satisfied the burden of demonstrating that the statements relied upon signified prohibited discrimination rather than innocent employment decisions.

In the event requisite findings of discrimination are made, back pay should be awarded only for losses resulting from unlawful discrimination. *See NLRB v. Plumbers & Pipefitters Local Union No.*

*403*, 710 F.2d 1418, 1420–21 (9th Cir.1983). Nothing in the Board's order should preclude the union and employer from entering into a valid agreement pursuant to section 8(f)(4) covering future layoffs and overtime.

PETITIONS FOR REVIEW GRANTED; ENFORCEMENT DENIED; CASE REMANDED TO THE BOARD.