**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 46, METALLIC LATHERS UNION AND REINFORCING IRON WORKERS OF NEW YORK AND VICINITY OF THE INTERNATIONAL ASSOCIATION OF STRUCTURAL AND ORNAMENTAL IRON WORKERS, Respondent.**

**Docket No. 97–4021.**

United States Court of Appeals, Second Circuit.

Argued Sept. 25, 1997.

Decided June 26, 1998.

---

Richard H. Markowitz, New York City (Markowitz and Richman, New York City, of counsel), for Respondent.

John D. Burgoyne, Assistant General Counsel, National Labor Relations Board, Washington, DC (Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, National Labor Relations Board, Washington, DC, of counsel), for Petitioner.

Before: MESKILL and CALABRESI, Circuit Judges, and BRIEANT, District Judge.*

Judge BRIEANT concurs in a separate opinion; Judge CALABRESI dissents in a separate opinion.

* Honorable Charles L. Brieant, United States District Judge for the Southern District of New York, sitting by designation.

MESKILL, Circuit Judge:

This petition presents the question of whether substantial evidence supports the National Labor Relations Board's (Board) conclusion that Local 46, Metallic Lathers Union and Reinforcing Iron Workers of New York and Vicinity of the International Association of Structural and Ornamental Iron Workers ("Local 46" or "the Union") violated sections 8(b)(1)(A) and (b)(2) of the National Labor Relations Act (Act) by refusing to refer work to a member-ironworker in retaliation for that ironworker's earlier racial discrimination charge against Local 46. *See Local 46, Metallic Lathers Union and Reinforcing Iron Workers of New York and Vicinity of the International Association of Structural and Ornamental Iron Workers,* 320 N.L.R.B. 982 (1996) (hereinafter "Local 46"). We conclude that substantial evidence supports the Board's finding that Local 46 was unlawfully motivated in its refusal to refer. However, because substantial evidence does not support the Board's denial to Local 46 of an affirmative defense under *NLRB v. Transportation Mgmt. Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), we conclude that Local 46 has not violated the Act, and that the ironworker suffered no cognizable injury as a matter of law. Consequently, we deny enforcement of the Board's order.

## BACKGROUND

This is a petition by the NLRB for enforcement of an order to redress allegedly unfair labor practices. We have jurisdiction to enforce that petition pursuant to § 10 of the Act, 29 U.S.C. § 160. The petition arises from the Board's finding that Local 46 engaged in unfair labor practices by refusing to refer work to one Fred James (James), an African–American ironworker and Union member, because James filed an earlier charge with the Board that alleged racial discrimination in the Union's work referral process. At the center of this action is the system by which Union members are referred work. We review that system before discussing James' complaint.

## 1. *The Work Referral System*

The Union is a signatory to a multi-party collective bargaining agreement with the Cement League (the League), an association composed of various employers engaged in the erection of concrete and cement structures. Pursuant to an exclusive work referral provision contained within that agreement, the Union refers its members, lathers and ironworkers, to League employers for work at various job sites in Manhattan. On July 16, 1971, following a labor dispute, Judge Marvin Frankel of the United States District Court for the Southern District of New York endorsed a Consent Decree setting forth the rules governing that exclusive work referral process. The objective of the rules was to ensure that all eligible workmen, regardless of race or union membership, share equally in available employment.

Under the rules, workers seeking referrals must personally appear at the Union hiring hall and sign a "hiring hall sheet" no later than 8:30 a.m. on any given workday (Rule II). After sign-in, the Union business agent announces to all registrants present in the hiring hall each available job, its location, expected duration if known, type of work, and any specific work experience required (Rule IV(B)(2)). The business agent then reviews the register and makes referrals based on a priority system that serves first those workers who have been out of work for the longest period of time.

Under the priority system, the business agent is required to maintain a cumulative, daily list for the previous two weeks of all workers who registered at the hiring hall and were not referred employment (Rule IV(C)(1)). Those workers whose names appear on the list more than five times in a two week period are entitled to priority of referral (Rule IV(C)(2)). For those workers counted on the priority list, a priority sequence is then established corresponding to the number of days that a worker registered but was not referred for employment. If more than one worker is entitled to the same priority, the worker who registers earlier on the day of referral is entitled to the first referral (Rule IV(C)(3)).

All employer requests for workers are submitted on "contractor sheets" and are date-and-time stamped at the time of receipt (Rule III(A)(1)). In all cases, the business agent is required to offer jobs in the order in which requests for workers are received (Rule IV(B)(1)). The Union may not grant an employer's request for the referral of a specific individual other than a foreman or a deputy foreman (Rule III(B)). When a worker accepts a job, he/she must then sign a contractor's sheet indicating an acceptance of the referral. The business agent then notes the referral, and the referred worker then carries a copy of that contractor's sheet to the job site where he/she presents it to the employer.

There are some exceptions to the priority system. If a job calls for certain specified skills, only workers having those skills will be eligible for that referral (Rule III(A)(4) and IV(B)(2)). Further, employer requests for minority workers are explicitly exempt from the priority system by Rule III(B), which provides that "[n]othing contained herein shall limit the Union's obligation to grant employer's requests, pursuant to requirements of Federal, State and Local law, that non-white workmen be referred." When employers request minority workers, the Union's practice is to write the letter "M" next to that minority worker's name on the contractor's sheet.

As with all rules governing the hiring hall, only the court-appointed Administrator has the power to modify or change the rules, and the administrator may do so only after consulting with "the Union and the Government." [1] (Rule VIII). The Administrator must then communicate the modification, in writing, to the Union and Government, and allow both parties fifteen days to apply to the district court for a determination as to the validity of that action (Rule VIII). Notwithstanding this procedure, it is undisputed on the record that over the years, the Administrator has orally modified the rules without any articulated objection. In particular, because there were men out of work for long periods of time, the Union sought and obtained from the Administrator a lengthening of the out-of-work period required for priority of referral from two weeks to three weeks. Under this scheme, the Union was permitted to place workers on the priority list who, over a three week period, had signed the register at least four times each week in a normal five day work week.

## 2. Fred James' Complaint

On April 25, 1994, James filed with the Board his initial unfair labor practice charge against the Union, alleging that since mid-November 1993 the Union had racially discriminated against him by refusing to refer work to him, in violation of sections 8(b)(1)(A) and (2) of the Act. [2] The charge listed Robert Ledwith, the Union business agent, as the Union representative to contact.

On May 13, 1994, James filed a second charge with the Board alleging that on May 9, 1994 the Union, acting through its business agent Robert Ledwith, refused to refer him to a League employer, Northberry Concrete Corporation (the "Northberry job") because of his April 25, 1994 charge. On July 28, 1994, the Board's General Counsel, in turn, issued a complaint against the Union (the James Complaint) for refusing to refer James to the Northberry job. Specifically,

---

1. Rule VIII does not reflect whether the term "Government" refers to the NLRB or the Secretary of Labor.

2. The Act provides in pertinent part:
 It shall be an unfair labor practice for a labor organization or its agents—
 (1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in section 157 of this title: *Provided,* That this paragraph shall not impair the right of a labor organization to prescribe its own rules with respect to the acquisition or retention of membership therein; . . .

 (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.
 29 U.S.C. § 158(b)(1)(A) and (2).

the General Counsel alleged that the Union had failed and refused to refer James to Northberry because James had filed a racial discrimination charge ·against the Union. The General Counsel argued that such conduct restrained and coerced employees in the exercise of their rights guaranteed by section 7 of the Act, all in violation of section 8(b)(1)(A) of the Act, and that the Union had attempted to cause and was causing Northberry to discriminate against employees who had filed charges with the Board in violation of section 8(b)(2) of the Act.[3] On August 8, 1994 the Union filed its answer to the complaint, denying any wrongdoing in refusing to refer James to the Northberry job and asserting that James was not referred to the Northberry job because he did not meet the priority criteria for referral on May 9, 1994. Specifically, on May 9, 1994 the priority list indicated that James had registered for referral eight times during the prior three week period. There were fifty-eight names on the list ahead of James, composed of individuals who had registered between nine and fifteen days during the previous three week period. The three men Ledwith did send out to the Northberry job (one George Caban, one Dennis Campbell, and one Daryl Moore) were all minorities and all outranked James on the list; Caban was ranked number one, Campbell was ranked number two, and Moore was ranked number eight.

### 3. *The Administrative Hearing*

On May 3, 1995, the parties appeared before Administrative Law Judge (ALJ) Robert T. Snyder in New York City for a hearing on the James complaint. At the hearing, James testified to the facts that prompted his charge of retaliation, facts which the Union does not dispute·here. Specifically, on the morning of May 4, 1994, James reported to the hiring hall, signed the hiring hall sheet and approached Ledwith and asked for a referral because he had been out of work for a long period of time. Ledwith replied that

Northberry Concrete Corporation, a League employer, would be starting a job the next week at 61st Street and West End Avenue in New York City, and that he would send James out on that job. The following week, on May 9, James reported to the hiring hall, signed the register, and learned that Ledwith had sent three men to the Northberry job earlier that morning. Upon learning of this, James approached Ledwith and reminded him of his earlier promise to send him out on that job. Ledwith, holding in his hand the letter from the Board regarding James' charge of racial discrimination, told James that he had planned to send him out to the Northberry job, but changed his mind when he received the letter from the Board.

While disputing these facts at the hearing, the Union argued that even if Ledwith was unlawfully motivated by retaliation when he refused to refer James to Northberry, the Union did not violate the Act, as under its hiring hall rules, Ledwith could not have referred James to the Northberry job given his low standing on the priority list. *See Radio–Electronics Officers Union v. NLRB*, 16 F.3d 1280, 1284–85 (D.C.Cir.), *cert. denied*, 513 U.S. 866, 115 S.Ct. 184, 130 L.Ed.2d 118 (1994)(if union can establish that it acted pursuant to the requirements of its rules, that justification serves as a defense to an unfair labor practice charge); *Transportation Mgmt. Corp.*, 462 U.S. at ·400, 103 S.Ct. 2469 (there is no violation of the Act if the union can establish that the action condemned would have occurred in any event and for valid reasons).

The General Counsel, on the other hand, sought to show that the Union was precluded from relying on the hiring hall rules as a defense to the retaliation charge. *See NLRB v. Laborers' Int'l Union*, 613 F.2d 203, 207–08 (9th Cir.1980) (a union may not rely on its hiring hall rules as a defense when the record demonstrates that the Union failed to consistently follow those rules, or injected discretion into its enforcement of those provi-

---

**3.** "The Board has consistently found a violation of section 8(b)(1)(A) and (2) of the Act where a union has discriminatorily refused to refer an employee for employment pursuant to the terms of an exclusive referral system in effect between the union and an employer. Such union conduct, by its very nature indirectly induces the Employer to refuse employment to that employee in violation of Section 8(a)(3)." *Electrical Workers IBEW Local 675*, 223 N.L.R.B. 1499, 1499 (1976) (footnote omitted).

sions). Accordingly, during the hearing the General Counsel offered a plethora of evidence that purported to show that Ledwith customarily violated the hiring hall rules on other occasions. The General Counsel's evidence and the ALJ's predicate findings were as follows:

### A. The Rodriguez Incident

James testified that he observed Ledwith circumventing the hiring hall rules during an incident that involved another Union member, Johnny Rodriguez. Specifically, James stated that he observed Ledwith, four or five months after the Northberry incident, skip over Rodriguez's name when calling out names for referral from the priority list—a bypass that James stated he was able to confirm by reviewing the weekly priority list posted in front of the hiring hall. According to James, Ledwith had skipped over Rodriguez because "[t]here had been some kind of confrontation between Rodriguez and Ledwith." *Local 46*, 320 N.L.R.B. at 988. The Union, observing that the incident had occurred four or five months after James' encounter with Ledwith, objected to the testimony for want of relevance, and then sought to have the proceeding continued in order to interview Rodriguez and seek his testimony. The ALJ overruled the Union's objection, and denied the motion for a continuance. Later in his decision, the ALJ found that this incident constituted the "greatest weight in demonstrating Ledwith's breach of the rules." *Id.* at 991.

### B. The 1995 James Incident

James also testified that Ledwith violated the hiring hall rules in January 1995 when he referred a job to James even though James reported to the hiring hall late, had not signed the hiring hall sheet and had not been present in the hiring hall when the job was called. The ALJ found that this testimony evinced Ledwith's "wide degree of discretion . . . in administering the hiring hall rules." *Id.* at 989.

### C. Jobs of Varying Duration

The General Counsel maintained, and the ALJ agreed, that Ledwith had the discretion at times to arbitrarily decide which workers received the more coveted, longer duration jobs. *Id.* at 987–88, 990. This finding was predicated on the ALJ's determination that there is nothing in the hiring hall rules to guide the business agent's discretion when multiple employers submit worker requests on the same day for jobs of varying duration. *Id.* at 990. Ledwith, however, testified that he did not have this discretion and used the priority list in making all referrals.

### D. Ledwith's Discretion and Minority Referrals

Ledwith also testified that in accordance with the hiring hall rules, it was his practice to refer non-white workers by name regardless of whether their names appeared on the priority list. In this regard, Ledwith testified that he referred minority ironworkers James Hatcher and Howard Golding to a Pinnacle Concrete job on May 9, 1994 even though Hatcher's name did not appear on the priority list, and despite the existence of other non-white workers on the priority list who had registered that morning at the hiring hall. In connection with this testimony, the Union produced for the hearing the contractor sheets for May 9, 1994 which indicated that Hatcher and Golding had been requested by name as minorities. The ALJ, however, determined that Ledwith's practice constituted an impermissible exercise of discretion under the referral rules because League employers may only request a foreman or deputy foreman by name (Rule III(B)) and, further, under the practice, "non white workers who [were not on the priority list] would be referred ahead of their brethren who [were on the priority list]." *Id.* at 987. Moreover, the ALJ noted that because the Union had failed to produce the actual worker request records from Pinnacle Concrete, the "lack of detailed request records," *id.* at 991, indicated that Ledwith had the discretion to arbitrarily select among nonwhite workers for referral in a manner "which precluded verification." *Id.* at 990.

### E. Specialty Referrals

Zaid Abdullah, a fellow ironworker, also testified that Ledwith had bypassed the hir-

ing hall rules. Specifically, Abdullah testified that in 1992 he was working at a Union job on 92nd Street in Manhattan. When this job was substantially completed, his position was terminated but certain other workers were retained to finish it. At the time of his termination, he resumed reporting to the hiring hall. Approximately one week later, three of the workers who had stayed on at the 92nd Street job were also terminated and they too returned to the hiring hall. On the very same day they returned, Ledwith referred them to a new job. After observing this, Abdullah approached Ledwith and asked him for a job. Ledwith responded by asking Abdullah if his name was on the priority list. Abdullah replied that he had just seen Ledwith refer the three workers from the 92nd Street job, and these workers could not have been on the list. Ledwith then explained that he referred them because of the special nature of the job, and their special skills in layout and in bending machine operation. Abdullah then told Ledwith that "a bunch of us" could perform layout and bending machine work, *id.* at 988, and testified that at the time of the incident, he had just finished a job at 92nd Street that involved layout work.

On cross-examination, however, Abdullah conceded that he had told Ledwith that he was not able to operate a bending machine. *Id.* From this testimony, the ALJ nevertheless found that Ledwith, by utilizing "subjective determinations of skill levels" had breached the hiring hall rules by referring "three workmen who could not have been on the priority list ... ahead of workmen who may have and probably did possess the special bending machine skills," and that "Abdullah's skill level in this area ... was probably satisfactory." *Id.* at 990.

### F. *Ledwith's Promise to Refer James to Northberry*

Based on James' testimony, the ALJ found that Ledwith in fact promised James the Northberry referral, a finding the Union does not dispute. This promise, the ALJ concluded, "alone show[ed] that Ledwith had the discretion to offer referrals when it suit-

ed the Union strategically to do so." *Id.* at 991.

### G. *Referrals and Equal Priority*

Ledwith testified that it was his practice to select workers of equal priority based on an alphabetical sequence. Rule IV(C)(3) requires, however, that if more than one worker is entitled to the same referral priority, the worker who registers at the hiring hall earlier on the day of referral is entitled to first referral. The ALJ found that this practice constituted "an arbitrary device that clearly impacted the job duration of workmen." *Id.* at 990.

### H. *Additional Evidence*

The evidence adduced at the hearing also indicated that Ledwith referred Daryl Moore to the Northberry job even though Moore, while present in the hiring hall and on the priority list, had not signed the hiring hall sheet on the morning of referral. Consequently, the ALJ determined that Moore's referral to Northberry violated the "sign-in" requirements of the rules. *Id.* at 988. Further, at the time of the hearing in 1995, Abdullah testified that he had received a job directly from a contractor in contravention to the exclusivity of the referral system, with the Union ratifying that action by providing Abdullah with a workslip to go to the job. The ALJ determined that such direct referrals constituted "[a]nother example of an informal variance[ ] from the referral rules." *Id.* at 990.

On September 25, 1995 the ALJ issued his Decision and Order, concluding that based on the evidence and predicate findings discussed above, Ledwith had administered the hiring hall rules in an "ambiguous atmosphere." *Id.* at 991. While the ALJ's discussion is unclear, it appears that he then reasoned that through this ambiguous atmosphere, Ledwith had acquired the "authority" to refer James to Northberry notwithstanding the hiring hall rules to the contrary. *Id.* at 991. Consequently, Ledwith, having the authority to refer James to Northberry, violated sections 8(b)(1)(A) and (b)(2) of the Act by reneging on his promise to refer James on

account of James' earlier racial discrimination charge against the Union. *Id.*

As a remedy for the violations found, the ALJ recommended, *inter alia*, that the Board order the Union to cease and desist from refusing to refer any applicant for employment because of that applicant's exercise of a right protected by the Act, and cease and desist from operating the hiring hall in an arbitrary and discriminatory manner. Furthermore, he recommended that the Board order the Union to compensate James with interest for any loss of earnings and benefits which he may have suffered since May 9, 1994 and recommended that the Board order the Union to post in the hiring hall for sixty days notice of the Board's findings and conclusions in this matter. *Id.* at 991–92.

On October 20, 1995, the Union filed with the Board exceptions to the ALJ's ruling and a supporting brief and the General Counsel filed an answering brief. After considering the issues raised, a three-member panel of the Board issued a Decision and Order dated March 22, 1996 adopting the ALJ's recommended order in its entirety.

### DISCUSSION

■ The Union now challenges the Board's Decision and Order, arguing that it is not supported by substantial evidence and is, accordingly, contrary to law. Specifically, the Union argues that the evidence does not support the Board's finding that Ledwith, and hence the Union, had the discretion to refer James to Northberry on May 9, 1994.

Consequently, without this discretion, the Union asserts that Ledwith was required under the hiring hall rules to refuse to refer James to Northberry, regardless of whether he was also motivated by retaliation. Because Ledwith could not have referred James to Northberry, the Union, citing *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced sub nom. NLRB v. Wright Line*, 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982), asserts that there can be no violation of the Act. We conclude that because the evidence does not support the finding that Ledwith inconsistently enforced the hiring hall rules or that Ledwith had injected discretion into the enforcement of the rules, Ledwith, and hence the Union, is entitled to rely on those rules as an affirmative defense. Because under the hiring hall rules the refusal to refer James would have occurred in any event and for valid reasons, James was not injured as a matter of law regardless of whether Ledwith was unlawfully motivated, and accordingly, there is no violation of the Act. Consequently, we deny enforcement of the Board's order.

■ In cases involving hiring halls, the Board has held that a *Wright Line* analysis is appropriate where there is an allegation of discrimination in hiring or referral procedures. *See Pacific Maritime Ass'n*, 308 N.L.R.B. 39, 46 (1992); *Teamsters Local 287 (Consolidated Freightways)*, 300 N.L.R.B. 539, 548 n. 20 (1990); *Polis Wallcovering Co.*, 262 N.L.R.B. 1336, 1341 n. 12 (1982). Under *Wright Line*,[4] the General Counsel has "the burden of proving that the [worker's] con-

---

4. In *Wright Line*, the Board considered the burdens of proof in cases brought under the Act, 29 U.S.C. §§ 151–69, which made it unlawful to discharge a worker because of his union activity. The formulation adopted was that the General Counsel had the burden of proving that unlawful animus was a "motivating factor" in the decision to discharge the employee. *Wright Line*, 662 F.2d at 902. The burden then shifted to the employer to prove by a preponderance of the evidence that it would have dismissed the employee for cause absent the discrimination. *Id.* If the employer met this burden, there would be a finding that no unfair labor practice had taken place. *Id.* On appeal, the First Circuit disagreed with the allocation of the respective burdens of proof set forth by the Board. *Wright Line*, 662 F.2d. at 904. The First Circuit agreed that the

General Counsel would make out a prima facie case by showing that anti-union animus was a "substantial" or "motivating factor" in the employer's decision. *Id.* at 904. However, it parted company with the Board with respect to the employer's burden. It held that once the general counsel met its burden of proof, the burden of production, not the burden of persuasion, shifted to the employer to "com[e] forward with credible evidence to rebut or meet the General Counsel's prima facie case." *Id.* at 904. In *NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the Supreme Court disagreed with the First Circuit's analysis in *Wright Line* and upheld the rule announced by the Board in *Wright Line*. *Id.* at 404, 103 S.Ct. 2469.

duct protected by § 7 was a substantial or a motivating factor in [the Union's decision to refuse to refer the worker to a job]." *Transportation Mgmt. Corp.,* 462 U.S. at 400, 103 S.Ct. 2469. "If the union is unable to rebut the General Counsel's proof, the union can still avoid being held in violation of [the Act] by proving by a preponderance of the evidence that the [refusal to refer] rested on the [worker's] unprotected conduct as well and that the [worker] would [not have been referred] in any event." *Id.* As the First Circuit explained, "[i]f the [refusal to refer] would have occurred *absent* the protected activity, it is clear no unfair practice existed since a bad motive without effect is no more an unfair labor practice than an unexecuted evil intent is a crime." *Wright Line,* 662 F.2d at 903. Proof that the refusal to refer "would have occurred in any event and for valid reasons amount[s] to an affirmative defense on which the [union] carrie[s] the burden of proof by a preponderance of the evidence." *Transportation Mgmt. Corp.,* 462 U.S. at 400, 103 S.Ct. 2469; *see also Torrington Extend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580, 591 (2d Cir.1994). The defense "requires a union to establish that it acted pursuant to a concrete standard—be it a collectively bargained provision, a written union rule, or a long-standing practice." *Radio–Electronics Officers Union,* 16 F.3d at 1285.

■ In this regard, a union may validly refuse to refer a worker to an employer where the referral would result in a violation of non-discretionary hiring hall rules. *See NLRB v. International Ass'n of BSR & OIW (Local 75),* 583 F.2d 1094, 1097 (9th Cir. 1978). However, a union may not cloak an act of illegal discrimination with the pretense of enforcing hiring hall rules when the record demonstrates that the union inconsistently or selectively enforced those rules. *Laborers' Int'l Union,* 613 F.2d at 207. In other words, the Union's affirmative defense is lost if the General Counsel is able to show that the union failed to "respect[ ] . . . the nondiscretionary referral process it was required to follow by [the Consent Decree]." *Id.* at 208 (citation and internal quotation marks omitted; second alteration in original). "When a union introduces an element of discretion into what is otherwise a non-discretionary process, the union may be held accountable for discriminatory exercise [or enforcement] of that discretion." *Id.; see also UBCJA Local 1914 (W & H Conveyor Systems),* 250 N.L.R.B. 1426, 1430 (1980).

In this case, the Union does not dispute the Board's finding that Ledwith promised James the Northberry referral on May 4, 1994 and then refused to refer him on May 9, 1994 in retaliation for James' April 25, 1994 charge. Rather, the Union avers that the Board erred in adopting the ALJ's finding that Ledwith, and hence the Union, inconsistently enforced the hiring hall rules, or had impermissibly injected discretion into the enforcement of otherwise non-discretionary rules, so as to deprive the Union of the affirmative defense under *Wright Line.* Specifically, the Union argues that the two incidents upon which the ALJ relied in making this finding, *i.e.,* the Rodriguez incident and the Abdullah incident, do not constitute substantial evidence that Ledwith inconsistently enforced the referral rules. In this regard, the Union argues that the Rodriguez incident is nothing more than hearsay that describes an incident occurring months after James' encounter with Ledwith, and the Abdullah incident is not probative of a violation of the referral rules. These incidents, however, were only two of many cited by the ALJ in support of his finding. Accordingly, while we disagree with the Union that the ALJ relied only on two incidents, we nevertheless agree with the Union that considering all of the incidents the ALJ considered, the record is devoid of substantial evidence that Ledwith inconsistently enforced the hiring hall rules, or had impermissibly injected discretion into the enforcement of otherwise non-discretionary rules.

■ Before discussing that evidence, we pause to correct an error in the ALJ's reasoning. Specifically, the ALJ concluded that, based on Ledwith's disregard for the hiring hall rules on other occasions, he had acquired the authority to disregard those rules and thus to refer James to Northberry. We know of no rule of law enabling one to attain the *authority* to disregard the provisions of a

Consent Decree by virtue of having violated that Decree on other occasions. Rather, as we have discussed, the law as it has developed precludes a union from asserting, as an affirmative defense to a charge of discrimination, that it was obligated by hiring hall rules to take the action condemned when there is proof that the union inconsistently or selectively enforced those rules on other occasions. *See Laborers' Int'l Union*, 613 F.2d at 207–08. Preclusion of an affirmative defense, and the authority to disregard a court order, are simply not one and the same.

 The Board's adoption of the ALJ's findings of fact can be overturned on review if those findings are not supported by substantial evidence on the record considered as a whole. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Substantial evidence has been defined as "more than a mere scintilla. It means such *relevant* evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at 477, 71 S.Ct. 456 (emphasis added; citation and internal quotation marks omitted); *see also NLRB v. Windsor Castle Health Care Facilities*, 13 F.3d 619, 623 (2d Cir.1994). "We have previously interpreted this to mean that reversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *NLRB v. Katz's Delicatessen*, 80 F.3d 755, 763 (2d Cir.1996) (internal quotation marks and citation omitted). "Suspicion, conjecture, and

theoretical speculation register no weight on the substantial evidence scale." *NLRB v. Mini–Togs*, 980 F.2d 1027, 1032 (5th Cir. 1993).

### 1. Post–Complaint Evidence

 We begin our review by observing that the ALJ, in reaching his conclusion that Ledwith had operated the referral process in a manner contrary to the hiring hall rules, relied in part on evidence of rule deviations occurring months after the Northberry incident. While we are mindful of the importance of "flexibility" in administrative procedure, that flexibility "does not go so far as to justify orders without a basis in evidence having rational probative force." *Consolidated Edison Co. of New York v. NLRB*, 305 U.S. 197, 230, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Evidence of hiring hall deviations occurring long after the action condemned is not relevant or probative to the issue of whether the Union failed to respect its referral rules *at the time of that action*, and is, accordingly, powerless to deny the union the affirmative defense. Our review of the pertinent cases reveals no authority to the contrary.[5]

 To be sure, when a union fails to respect its hiring hall rules in making referral decisions, it loses its right to invoke those rules as a defense to its future referral decisions. *See, e.g., Laborers' Int'l Union*, 613 F.2d at 208. The shield is lost at the moment the Union decides to exercise its own discretion contrary to the non-discretionary

---

**5.** Judge Calabresi, in dissent, points to cases for the proposition that hiring hall rule deviations occurring long after the action condemned are relevant to the issue of whether the Union failed to respect its referral rules at the time of that action. But, as those cases demonstrate, subsequent inconsistent applications of the rules are relevant only when the Union's practices at a prior time are in issue. *See Lewis v. Baker*, 526 F.2d 470, 474 (2d Cir.1975) ("When the state of an object at a particular time *is in issue*, we have repeatedly upheld the relevancy of evidence of that object's condition before and after the time in question."); *Missouri K. & T. Rye Co. v. Williams*, 103 Tex. 228, 125 S.W. 881, 883 (1910) ("When the *question is as to a condition existing at one time*, evidence as to that at a different time" may or may not be probative.); *see, e.g., Henry v. County of Shasta*, 132 F.3d 512, 519

(9th Cir.1997) (post-event evidence admissible to prove that instance of police misconduct was result of municipal policy or custom); *Manning v. New York Tel. Co.*, 388 F.2d 910, 912 (2d Cir.1968) (condition was defective utility pole step); *DiLeo v. Lincoln Ctr. for the Performing Arts*, 38 A.D.2d 830, 831, 329 N.Y.S.2d 637, 639 (2d Dep't 1972) (condition of concrete roof); *Facci v. General Electric Co.*, 192 A.D.2d 991, 993, 596 N.Y.S.2d 928, 929 (3d Dep't 1993) (deep fat fryer); *School Bd. v. Department of Health, Educ. & Welfare*, 525 F.2d 900, 908 (5th Cir.1976) (discriminatory policy at private schools). There is no competent evidence that the Union inconsistently enforced the referral rules at the time of the action condemned. Therefore, the Union's practices during that time are not in issue. Accordingly, subsequent violations of the referral rules simply are not relevant.

referral rules. *Id.* Up until that moment, the Union is entitled to rely on its referral rules as an affirmative defense to any charge of unfair labor practices. Consequently, the defense may not be vitiated by evidence of referral rule deviations occurring long after the action condemned, as at the time of that action, the shield remained valid. Condoning such "after the fact" evidence would allow a worker, aggrieved by a union's legitimate enforcement of its referral rules, to maintain a cause of action against the Union with nothing but a hope that in the future the Union might deviate from its referral rules. Consequently, evidence of hiring hall rule deviations occurring after the Northberry incident, that is, the "Rodriguez Incident," the "1995 James Incident," and Abdullah's testimony regarding direct referrals, is not relevant to the issue of whether the Union may rely on its hiring hall rules as an affirmative defense, and accordingly does not constitute substantial evidence.

### 2. *Jobs of Varying Duration*

■■■ The ALJ found that Ledwith had the discretion to decide arbitrarily which workers received the more coveted, longer duration jobs because the hiring hall rules do not articulate how the business agent should go about making referrals when multiple employers submit requests for workers on the same day. *See Local 46,* 320 N.L.R.B. at 987–88, 990. We reject this finding as an erroneous construction of the referral rules and conclude that even if Ledwith did have this discretion, there is no evidence in the record that Ledwith impermissibly exercised it. First, as Ledwith testified, the rules do not offer the business agent the discretion to decide which workers receive the longer duration jobs.[6] Specifically, Rule III(A)(1) requires the business agent or other union personnel to date-and-time stamp employer requests for referrals at the time of receipt. Rule IV(B)(1) then requires the business agent to offer jobs in the order in which requests for workers are received. Accord-

ingly, as part of the referral rules, all jobs, whether of long duration or short duration, are offered in the order received as marked by a date-and-time stamp. Thus, contrary to the ALJ's finding, Ledwith did not have this discretion. Because there is no evidence in the record that Ledwith ever introduced an element of discretion when enforcing these non-discretionary rules, the ALJ's finding cannot stand on review. Secondly, even if the rules are silent on this point, discretion alone is not conduct that can vitiate a union's affirmative defense under *Wright Line.* There must be some showing that the Union wielded that discretion invidiously or arbitrarily. *See NLRB v. Ironworkers Local Union No. 505,* 794 F.2d 1474, 1478 (9th Cir.1986). Because there is no evidence in the record that Ledwith asserted such discretion arbitrarily, the ALJ's finding cannot stand.

### 3. *Ledwith's Discretion and Minority Referrals*

■■■ Ledwith testified that he referred minority workers by name regardless of whether their names appeared on the priority list. The ALJ found that this practice constituted an impermissible exercise of discretion under the referral rules because League employers may only request a foreman or deputy foreman by name (Rule III(B)) and furthermore, under Ledwith's practice "nonwhite workers who [were not on the priority list] would be referred ahead of their brethren who [were on the priority list]." *See Local 46,* 320 N.L.R.B. at 987, 991. We disagree with the ALJ that Ledwith impermissibly exercised discretion in this aspect of the process.

Rule III(B) provides, in pertinent part, that "*[n]othing* contained herein shall limit the Union's obligation to grant employer's requests ... that non-white workmen be referred" (emphasis added). The phrase "nothing contained herein" is absolute in its command. Because the phrase explicitly exempts employer requests for minority refer-

---

**6.** The ALJ incorrectly noted in his opinion that "Ledwith agreed that nothing in the rules sets out how he should go about making referrals when he receives multiple contractor requests for workmen on the same day before seeking

workers for these jobs." *Local 46,* 320 N.L.R.B. at 987. Ledwith never agreed to what was in fact the General Counsel's assertion. Moreover, Ledwith explicitly testified that he did not have this discretion.

rals from all other hiring hall rules, it permits employers to request a minority worker by name, and in no way requires the business agent to refer only those minority workers listed on the priority list.[7] Accordingly, because it cannot be said that Ledwith, by referring minorities in this manner, either inconsistently enforced the hiring hall rules or had impermissibly injected discretion into the enforcement of otherwise non-discretionary rules, the ALJ's finding to the contrary cannot stand on review.

### 4. *Specialty Referrals*

■ Abdullah testified that Ledwith referred three workers ahead of him to a specialty job requiring skills in layout and bending machine operation. As Abdullah explained, Ledwith made this referral even though "a bunch of us" could have done this work and despite Abdullah's assertion that, at the time of the incident, he had just finished a job on 92nd Street involving layout work. However, Abdullah conceded on cross-examination that he had previously told Ledwith that he did not have the skills to operate a bending machine. Nevertheless, the ALJ found that "Abdullah's skill level in this area ... was probably satisfactory," and that others present in the hiring hall "probably ... possess[ed] the special bending machine skills." *Local 46,* 320 N.L.R.B. at 990. We reject such a speculative finding.

■ Failure to follow objective standards in assessing worker qualifications for specialty referrals may constitute a breach of a union's duty of fair representation to all qualified applicants. *See Plumbers and Pipe Fitters Local Union No. 32 v. NLRB,* 50 F.3d 29, 34–35 (D.C.Cir.1995). However, conjecture based on impeached testimony does not constitute substantial evidence. *See Woods v. United States,* 724 F.2d 1444, 1451 (9th Cir.1984) ("Substantial evidence cannot be based upon an inference drawn from facts

which are uncertain or speculative and which raise only a conjecture or a possibility."); *Radio Officers' Union of Commercial Telegraphers Union, AFL v. NLRB,* 347 U.S. 17, 49, 74 S.Ct. 323, 98 L.Ed. 455 (1954) (Board may draw reasonable inferences from proven facts, not conjecture.). Accordingly, because there is no evidence in the record that Ledwith improperly exercised his discretion to assess worker qualifications for specialty referrals, the finding cannot stand on review.

### 5. *Ledwith's Promise to Refer James to Northberry*

■ As determined by the ALJ, and undisputed here by the Union, Ledwith did in fact promise James the Northberry job on May 4, 1994. The ALJ found that the promise "alone show[ed] that Ledwith had the discretion to offer referrals when it suited the Union strategically to do so." *Local 46,* 320 N.L.R.B. at 991. We agree that at the very least the promise evinces a willingness to "introduce[ ] an element of discretion into what is otherwise a non-discretionary process." *Laborers' Int'l Union,* 613 F.2d at 208. However, because it was a promise that was never kept, we conclude that the action did not sufficiently compromise the referral process so as to constitute an impermissible introduction of discretion.

■ When a union official in an oral statement introduces an element of discretion into non-discretionary referral rules, that statement alone does not preclude the union from relying on the referral rules as a defense to a charge of discrimination. Rather, the union crosses the line and vitiates the defense when it injects that discretion into the *"enforcement* of hiring hall provisions." *Laborers' Int'l Union,* 613 F.2d at 208 (emphasis added). When Ledwith promised James the Northberry referral, he exceeded his authority but he did not impermissibly enforce any provision. To the contrary, when it came time for Ledwith to deliver on

---

7. Subsumed in our conclusion is the rejection of the ALJ's finding that there was a "lack of detailed request records" in connection with Ledwith's referral of minority workers Hatcher and Golding to the Pinnacle job. *Local 46,* 320 N.L.R.B. at 991. We perceive no want of detail. The contractor sheets produced at the hearing noted that Hatcher and Golding were requested by name. The failure of the Union to produce additional records to prove that Pinnacle actually requested them by name does not constitute substantial evidence that Ledwith had the discretion to select arbitrarily among non-white workers for referral.

the promise, he reneged and declined to enforce that discretion. *Compare Laborers' Int'l Union,* 613 F.2d at 208 (where union introduces discretion contrary to the rules and then enforces that discretion by allowing worker to remain on a job without the required workslip, the union loses the protection of its referral rules as a defense when, after learning of the workers dissident activities, removes that worker from the job for want of a referral slip); *Construction, Bldg. Materials & Misc. Drivers Local 83,* 233 N.L.R.B. 509 (1977), *enforced sub nom. Construction, Bldg. Materials & Misc. Drivers Local No. 83 v. NLRB,* 590 F.2d 316 (9th Cir.1979) (where union introduces discretion contrary to the rules and then enforces that discretion by making a high priority job available to a low priority worker, and that low priority worker declines the job, the union loses the protection of the referral rules as a defense when it refuses to make that same high priority job available to a second low priority worker). Accordingly, we reject the ALJ's finding that Ledwith's promise to refer James to Northberry constituted an impermissible exercise of discretion under the referral rules.

#### 6. *Violations Not Indicative of Impermissible Discretion*

█ We leave undisturbed the Board's findings that Ledwith violated the hiring hall rules on the following two occasions. First, Ledwith's practice of referring workers of equal priority in the order in which they appeared alphabetically is contrary to the first-to-sign-in rule, Rule IV(c)(3). We conclude, however, that because an alphabetical sequence is as objective as the first-to-sign-in rule and as practiced, was not objected to and did not afford Ledwith the discretion arbitrarily to make referral decisions, the practice is not relevant to whether the Union is precluded from asserting an affirmative defense under *Wright Line. Cf. Boilermakers Local No. 374 v. NLRB,* 852 F.2d 1353, 1358 (D.C.Cir.1988) ("[A] union commits an unfair labor practice if it administers the exclusive hall arbitrarily and without reference to objective criteria").

█ Second, Ledwith violated the sign-in rules when he referred Daryl Moore to the Northberry job on May 9, 1994, even though Moore had not signed the hiring hall sheet. However, because Moore was ahead of James on the priority list and present in the hiring hall when the job was called, Ledwith's conduct in referring him despite Moore's failure to sign in is more akin to a simple oversight than evidence of union disregard for the referral rules and did not result in unfair prejudice to anyone. Accordingly, we conclude that this finding is not relevant to whether the Union is precluded from asserting an affirmative defense under *Wright Line.*

In any event, as with hiring hall rule deviations that occur as a result of temporary and exigent circumstances and are not indicative of a Union's invidious wield of authority, the hiring hall rule deviations here "cannot justify requiring the union to repeat its violation in another case." *Int'l Ass'n of BSR & OIW (Local 75),* 583 F.2d at 1097.

In sum, because the ALJ's findings of fact do not constitute substantial evidence that Ledwith, and hence the Union, inconsistently enforced the hiring hall rules or impermissibly injected discretion into the enforcement of otherwise non-discretionary rules, the Union may assert the hiring hall rules as a valid defense.

### CONCLUSION

We conclude that substantial evidence supports the Board's finding that Local 46 was unlawfully motivated in its refusal to refer James to the Northberry job. However, because Local 46 has demonstrated by a preponderance of the evidence in the form of its referral rules that it would not have referred James even in the absence of an unlawful motive, we conclude that substantial evidence does not support the Board's denial to Local 46 of an affirmative defense under *Transportation Mgmt. Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667. Accordingly, because Local 46 has demonstrated that it is entitled to the affirmative defense, we conclude that Local 46 has not violated the Act and that James suffered no cognizable injury as a

matter of law. Consequently, we deny enforcement of the Board's order.

BRIEANT, District Judge, concurring:

I concur in the result reached by Judge Meskill and adopt his analysis so far as it goes, but rely on the additional reasoning set forth below.

Because a labor union is a voluntary organization it may be that, in an ordinary case, as our distinguished dissenting colleague points out, the union may enforce its hiring hall rules "inconsistently or selectively" with the express or implied consent of the members or their elected leaders. Local 46 is not an ordinary case. In Local 46 the rules of the hiring hall are either prescribed or received as having the force of law, by reason of the Consent Decree of the Southern District of New York (Marvin Frankel, J.), issued February 25, 1970. *United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46,* [2 EPD ¶ 10,226], 1970 WL 104 (S.D.N.Y. 1970). Judge Frankel amended the Consent Decree by a Supplemental Opinion issued following a contempt proceeding, *United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46,* [3 EPD ¶ 8204], 328 F.Supp. 429, 443 (S.D.N.Y. 1971), and then issued a Memorandum Confirming Rules and Procedures on July 16, 1971, *United States v. Wood, Wire and Metal Lathers Int'l Union, Local 46,* 68 Civ. 2116 (S.D.N.Y. 1971).

A consent decree carries the full force of a contested decision on the merits. "This is so because the entry of a consent judgment is an exercise of judicial power ... that is entitled to appropriate respect and because of the policy favoring finality of judgments." *Amalgamated Sugar Co. v. NL Indus., Inc.,* 825 F.2d 634, 639 (2d Cir.1987) (internal citations omitted), *cert. denied sub nom Rothenberg v. Amalgamated Sugar Co.,* 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987); *see also Wallace Clark & Co. v. Acheson Industries, Inc.,* 532 F.2d 846, 848 (2d Cir.1976), *cert. denied,* 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976).

The record is clear that Local 46 Business Agent Robert Ledwith corruptly promised complainant Fred James that he would refer James to the Northberry job, not yet in the hiring hall but expected in the coming week. James knew, as did Ledwith, that such a reference would violate the Consent Decree and would be a breach of Ledwith's fiduciary obligations to the other unemployed members. Ledwith later decided not to keep his illegal contract with James, not because of a sudden return to virtue, but out of retaliatory animus for James having complained to the NLRB.

Under the circumstances, neither this Court nor the Board may lawfully order the Union to compensate James for the loss of the benefits of his illegal bargain with Ledwith. To do so, we would be acting as a "paymaster of the wages of crime, or referee between thieves." *Stone v. Freeman,* 298 N.Y. 268, 271, 82 N.E.2d 571, 572 (1948) (Desmond, J.), quoting *Schermerhorn v. Talman,* 14 N.Y. 93, 141 (1856). *See also Walters v. Fullwood,* 675 F.Supp. 155, 160 (S.D.N.Y. 1987); *Tarbert Trading, Ltd. v. Cometals, Inc.,* 663 F.Supp. 561, 567 (S.D.N.Y. 1987); *Islamic Republic of Iran v. Pahlavi,* 94 A.D.2d 374, 382, 464 N.Y.S.2d 487, 498 (1st Dep't 1983), *aff'd,* 62 N.Y.2d 474, 478 N.Y.S.2d 597, 467 N.E.2d 245 (1984), *cert. denied,* 469 U.S. 1108, 105 S.Ct. 783, 83 L.Ed.2d 778 (1985) (Kupferman, J., concurring) (a "court should not lend its aid to a corrupt or evil design"). It is well settled law that illegal promises will not be enforced by the courts. The law leaves knowing parties to an illegal agreement where it finds them and gives no relief. *Kaiser Steel Corp. v. Mullins,* 455 U.S. 72, 76–78, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982) ("[i]n such cases the aid of the court is denied, not for the benefit of the defendant, but because public policy demands that it should be denied without regard to the interests of individual parties")(internal citations omitted); *United States v. Bonanno Organized Crime Family of La Cosa Nostra,* 879 F.2d 20, 28 (2d Cir. 1989) (same); *Flegenheimer v. Brogan,* 259 A.D. 347, 349, 19 N.Y.S.2d 343, 345 (2d Dep't 1940), *aff'd,* 284 N.Y. 268, 30 N.E.2d 591 (1940) ("the *Dutch Schultz* case").

While the 1971 Consent Decree remains in force, it must be obeyed. If changing times and circumstances have brought undue stric-

tures or inutility, Local 46 is free to seek a modification or vacatur from the district court. But while the decree remains in effect we cannot reward those such as James who agree to benefit from its knowing violation.

CALABRESI, Circuit Judge, dissenting:

Unlike the majority, I believe that substantial evidence supported the Board's finding that the Union inconsistently enforced the hiring hall rules, and therefore that the Union was not entitled to use those rules as an affirmative defense against the charges of discrimination. Accordingly, I respectfully dissent.

For the most part, I agree with the majority's statement of the law. As the majority explains, under the test established in *Wright Line*, 251 N.L.R.B. 1083 (1980), *enforced*, 662 F.2d 899 (1st Cir.1981), and approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), the NLRB's General Counsel has the initial burden of proving by a preponderance of the evidence that retaliation for the union member's protected conduct was "a substantial or a motivating factor" in the union's action. *Transp. Management*, 462 U.S. at 400, 103 S.Ct. 2469; *accord Office & Prof'l Employees Int'l Union v. NLRB*, 981 F.2d 76, 85 (2d Cir.1992). Once that has been shown, the burden shifts to the union to prove, also by a preponderance of the evidence, that it would have taken the same action for valid reasons, even absent the improper motive. *See Transp. Management*, 462 U.S. at 400, 103 S.Ct. 2469; *Office & Prof'l Employees Int'l Union*, 981 F.2d at 85. To defend successfully on this basis, the Union must "establish that it acted pursuant to a concrete standard—be it a collectively bargained provision, a written union rule, or a long–standing practice," *Radio–Elecs. Officers Union v. NLRB*, 16 F.3d 1280, 1285 (D.C.Cir.1994).

A union may not, however, rely on its hiring hall rules as a defense when the record shows that it inconsistently or selectively enforced those rules. *See NLRB v. Laborers' Int'l Union of North Am.*, 613 F.2d 203, 207–08 (9th Cir.1980). "When a union introduces an element of discretion into what is otherwise a non–discretionary process, the union may be held accountable for discriminatory exercise [or enforcement] of that discretion." *Id.* at 208.

I also agree with the majority that substantial evidence supported the NLRB's finding that the General Counsel established by a preponderance of the evidence that the Union's refusal to refer James to the Northberry job was motivated by an unlawful desire to retaliate against James for filing an earlier complaint with the NLRB. But I part ways with the majority on the issue of whether substantial evidence supports the Board's conclusion that the union had not proven that it would have taken the same action absent the improper motive—*i.e.*, I believe that substantial evidence supported the Board's finding that, because the union had applied the hiring hall rules in an inconsistent and discretionary manner in the past, the union could not use those rules to prove its affirmative defense.

The standard by which we review decisions of the NLRB is highly deferential. This court must enforce the NLRB's order if the Board's "factual findings are supported by substantial evidence on the record as a whole." *NLRB v. Katz's Delicatessen of Houston St., Inc.*, 80 F.3d 755, 763 (2d Cir. 1996). This means that "reversal based upon a factual question will only be warranted if, after looking at the record as a whole, we are left with the impression that no rational trier of fact could reach the conclusion drawn by the Board." *Id.* at 763 (quoting *NLRB v. Albany Steel, Inc.*, 17 F.3d 564, 568 (2d Cir. 1994) (internal quotation marks omitted)). We must defer to the Board's determinations on the credibility of the witnesses and on the weight to be given to different pieces of evidence. *See, e.g., Abbey's Transp. Servs., Inc. v. NLRB*, 837 F.2d 575, 579 (2d Cir. 1988)("In reviewing the Board's action in this regard, the test we apply is not whether we might make a different choice between inferences were the matter before us were the matter before us de novo, but whether there is substantial evidence on the record as a whole to support the Board's finding.").

The majority thoroughly—elegantly even—catalogs the substantial evidence that supported the Board's finding that the Union enforced the hiring hall rules inconsistently. But it then improperly substitutes for the view of the Board its own judgment as to the weight to be given to that evidence.

The evidence included: (a) testimony that in the fall of 1994, four or five months after the Northberry incident, Ledwith skipped over Johnny Rodriguez's name in violation of the hiring hall rules; (b) testimony that Ledwith had violated the rules in January 1995 by referring James to a job even though James had not signed the hiring hall sheet and had not been present in the hiring hall when the job was called; (c) evidence that Ledwith had the discretion to decide arbitrarily which workers received the longer duration jobs; (d) proof that, in May 1994, Ledwith referred minority workers to jobs when they were requested by name by employers, even though their names did not appear on the priority list, and despite the existence of other non–white workers on the priority list who had registered that morning at the hiring hall; (e) testimony that indicated that Ledwith, by utilizing "subjective determinations of skill levels" had breached the hiring hall rules by referring "three workmen who could not have been on the priority list .... ahead of workmen who may have and probably did possess the special bending machine skills"; (f) the fact that Ledwith had promised to refer James to the Northberry job, which suggested that Ledwith thought he had the discretion to make such a referral; (g) Ledwith's testimony that it was his practice to select workers of equal priority based on an alphabetical sequence, rather than pursuant to the hiring hall rule that required referral according to which worker had registered earlier on the day in question; (h) evidence that Ledwith had referred Daryl Moore to the Northberry job even though Moore had not signed the hiring hall sheet on the morning of referral.

The majority dismisses the bulk of this evidence by ruling that the NLRB was not allowed to consider rule deviations that occurred subsequent to the Northberry incident. The majority contends that "[e]vi-dence of hiring hall deviations occurring long after the action condemned is not relevant or probative to the issue of whether the Union failed to respect its referral rules *at the time of that action.*" Maj. Op. at 104.

But "[w]hen the state of an object at a particular time is in issue, we have repeatedly upheld the relevancy of evidence of that object's condition before and after the time in question." *Lewis v. Baker,* 526 F.2d 470, 474 (2d Cir.1975). We have further stated that "the weight to be given evidence of prior and subsequent condition differs in each case and is of course a question for the trier of fact." *Id.* at 475; *see also Manning v. New York Tel. Co.,* 388 F.2d 910, 912 (2d Cir.1968)("Whether evidence of a subsequent condition should be admitted depends upon the time elapsed and the likelihood of a change in condition during that interval. Absent an abuse of discretion, a trial judge's decision to admit such evidence will not be disturbed on appeal."); *Henry v. County of Shasta,* 132 F.3d 512, 519 (9th Cir.1997), *as amended,* 137 F.3d 1372, 1372 (9th Cir.1998) (stating that "we reiterate our rule that post–event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but may be highly probative with respect to that inquiry" and collecting cases that support the view that the policies of an institution at a particular time can be demonstrated by evidence of subsequent events); *School Bd. v. Department of Health, Educ. & Welfare,* 525 F.2d 900, 908 (5th Cir.1976) ("In determining whether evidence of a subsequent condition may be utilized to establish its prior existence, we must consider both the time period which has elapsed, the nature of the fact to be established, and the likelihood of a change in that fact during the time interval.") (citing 2 Wigmore, Evidence 437, at 413 (1940)); *Facci v. General Elec. Co.,* 192 A.D.2d 991, 992, 596 N.Y.S.2d 928, 929 (App. Div., 3d Dep't 1993) ("[B]oth prior and subsequent accidents may be proffered to demonstrate that a product is dangerous or defective."); *DiLeo v. Lincoln Ctr. for the Performing Arts,* 38 A.D.2d 830, 831, 329 N.Y.S.2d 637, 639 (App. Div., 2d Dep't 1972) ("The admissibility of evidence of a prior or subsequent condition or existence of an object so as to

give rise to an inference of such condition or existence at the time in question depends on the circumstances of the particular case."); *Missouri, Kan. & Tex. Ry. v. Williams*, 103 Tex. 228, 125 S.W. 881, 882–83 (1910) (providing a classic statement of the evidentiary principle that "[w]hen the question is as to a condition existing at one time, evidence as to that at a different time" may or may not be probative, depending on whether the condition is "ephemeral" or "permanent or lasting") (cited in *Clark v. Commissioner*, 143 F.3d 115, 119 n.1 (2d Cir.1998)).

The notion that prior or subsequent actions of an organization are relevant to prove the conduct of the organization on a particular occasion is acknowledged by Federal Rule of Evidence 406, which provides that "[e]vidence of the habit of a person or of the routine practice of an organization ... is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

In the case before us, the NLRB was entitled to consider the evidence of the Union's subsequent violations of the hiring hall rules in determining whether the Union had a habit or routine practice of violating those rules. The evidence that Ledwith, during the relevant time frame, acted as if he had the authority to deviate from the rules, combined with the proof of his subsequent departures from the rules, was sufficient to support the Board's finding. Ledwith, by promising to refer James to the Northberry job, acted as if he was willing to deviate from the rules *at the relevant time.* That same day, he referred Darryl Moore to the Northberry job, in clear violation of the rules and despite the fact that Moore had not signed

the register. The majority inexplicably dismisses this event, which I emphasize once more occurred *on the day of the retaliation,* as "more akin to a simple oversight than evidence of union disregard for the referral rules." Maj. Op. at 107. These facts, combined with the evidence of Ledwith's deviations from the hiring hall rules on subsequent occasions, were, in my view, clearly sufficient to support the Board's conclusion that the Union failed to prove that it would have taken the same action absent the improper motive.[1]

Were it our job to review the evidence *de novo,* I might agree with the majority. But in light of our duty merely to determine whether the NLRB's factual findings were supported by substantial evidence, I cannot countenance the majority's reweighing of the evidence. Accordingly, I respectfully dissent.

---

1. I also disagree with the majority's stated reasons for dismissing some of the other evidence that showed that Ledwith had discretion in applying hiring hall rules. In particular, I am puzzled by the majority's assertions that "discretion alone is not conduct that can vitiate a union's affirmative defense under *Wright Line,*" and that "[t]here must be some showing that the Union wielded that discretion invidiously or arbitrarily." Maj. Op. at 105. The nature of discretion is that it allows one to make arbitrary decisions, and thus permits discrimination by those who are of a mind to discriminate. *See Laborers' Int'l Union,* 613 F.2d at 208 ("When a union introduces an element of discretion into what is otherwise a non–discretionary process, the union may be held accountable for discriminatory exercise [or enforcement] of that discretion."). And in this respect, I once again note that the majority concedes the existence of substantial evidence supporting the NLRB's finding that the Union's treatment of James was motivated by its unlawful desire to retaliate against him. But I believe it is not necessary to reach this question since the evidence of Ledwith's actual *deviations* from the rules (as opposed to the evidence that he had considerable *discretion under* those rules) is sufficient to support the NLRB's conclusion.